Filed 12/14/15  In re M.M. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re M.M. et al., Persons Coming Under the Juvenile Court Law. | B259253 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.O., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK00167) |

APPEAL from orders of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel; Dawyn R. Harrison, Assistant County Counsel; and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

The Los Angeles County Department of Children and Family Services filed a petition under Welfare and Institutions Code section 300 alleging that S.O. had engaged in conduct that caused her daughter, M.M., to become alienated from the child's father. The juvenile court sustained the petition as true, declared M.M. to be a dependent of the court and ordered her removed from mother's custody.

On appeal, S.O. contends there was insufficient evidence to support the court's findings that: (1) M.M. was suffering from serious emotional damage within the meaning of Welfare and Institutions Code section 300, subdivision (c); and (2) leaving M.M. in S.O.'s custody would present a substantial danger to the child's physical or emotional well-being. (See Welf. & Inst. Code, § 361, subd. (c) (1).) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Referral and Detention*

#### 1. *Events preceding the section 300 petition*

On July 23, 2013, Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging physical and sexual abuse of M.M., a twelve year-old female, by her father Joseph M. (father). According to the referral, M.M.'s parents were involved in an "ongoing custody dispute." M.M. informed the reporting party that father had slapped her face and scratched her arms after she refused to enter his bedroom. The referral indicated M.M. was being held at a police station and appeared to be fearful of father, who DCFS had previously investigated for sexual abuse "when [the child] was eight or nine years old."

DCFS traveled to the police station and attempted to interview father about the allegations. Father's attorney informed DCFS he had represented father for over nine years in an ongoing custody dispute with the child's mother, S.O. (mother). The attorney stated that he believed the "allegations being leveled against father were bogus," and that "the child's mother[] was . . . responsible for the child conjuring up such allegations." The attorney explained that, on the previous day (July 22, 2013), a family court judge had issued an order awarding father "temporary sole . . . custody" of M.M. The attorney

2

provided a copy of the order, which included a provision stating that mother was to have no contact with M.M., either directly or through a representative, until the next family court hearing. Despite that order, mother's attorney had called M.M. after the child was detained by the police. Father's attorney also reported that when M.M. arrived at the police station, someone had been waiting for her with clothing and a stuffed animal, suggesting another party was aware of the child's situation. M.M. was also found to be in possession of $120 in cash and two cell phones. One of the phones was concealed in a "secret compartment" of the child's pants. Although the attorney "stopped short of accusing mother of being involved," it was apparent to DCFS that he believed mother had induced the child to make the abuse allegations against father.

Father told DCFS that he and mother had "f[ought]t constantly" during their seven-year marriage, and that "their physical aggressions lead to the two of them being arrested for Domestic Violence." According to father, mother was "infuriated" by the divorce, which had occurred when M.M. was three-and-a-half years old. Father believed mother was trying to turn M.M. against him as "a way of exacting revenge." Father "categorically denied all allegations" of abuse, stating that he "love[d] his child unconditionally and that he would never harm her."

DCFS also interviewed M.M., who stated that father sexually abused her "each time . . . she visits." The child alleged father had tried to force her into his bedroom the previous night, and then slapped her face and scratched her arms when she resisted. DCFS observed scratches on the child's arms, but no marks on her face. M.M. told DCFS "the physical and sexual abuse [was] ongoing," and that she had no desire to maintain any relationship with father. Although M.M. alleged she had been "victimized by her father repeatedly[,] she had great difficulty in remembering exactly when such incidents too[k] place." She claimed that father's sexual molestation included "fondling her breast and vaginal area on top of and underneath her clothing." M.M. also stated that each time father molested her, she had "immediately [told] her mother about her ordeal. . . ." M.M. reported that "mother love[d] her and [wa]s willing to do whatever it

3

t[ook] to protect her."  The child also said she was "extremely fearful of returning to her father's house" because she was certain the "abuse would . . . continue."

### 2.  *Section 300 petition and detention*

On July 29, 2013, DCFS filed a petition against father alleging M.M. fell within the jurisdiction of the juvenile court under Welfare and Institution Code section 300, subdivisions (a), (b) and (d).[1]  The petition included counts under subdivisions (a) and (b) alleging that on July 23, 2013, father had slapped M.M. in the face and "forcibly grabbed the child's arms," resulting in "unreasonable pain and suffering."  The petition included additional counts under subdivisions (b) and (d) alleging father had "[o]n prior occasions, . . . sexually abused the child by fondling the child's vagina and breast over and underneath the child's clothing."

DCFS filed a detention report in support of the petition summarizing its initial interviews with father, father's attorney and M.M.  DCFS confirmed that the day before M.M. had been detained from father, the family court issued an order awarding him temporary custody of M.M. and requiring mother to have no contact with the child.  DCFS explained that the family court's order was predicated on a recent child evaluation that suggested mother was currently "unstable."  Mother told DCFS the evaluation "gross[ly] distort[ed] . . . the facts" and that she intended to "challenge" it.  Mother also stated she believed father had paid the child evaluator to write a report "that would cast him as being a concerned and loving parent."

DCFS recommended that M.M. remain detained from both parents, noting that the child evaluation had specifically found the child would be at risk of harm if left in mother's care.  DCFS also recommended the juvenile court order a "mental and developmental assessment of the child" and a "Multidisciplinary Assessment [MAT] of the children and family."

---

**1**      Unless otherwise noted, all further statutory citations are to the Welfare and Institutions Code.

At the detention hearing, the juvenile court found there was prima facie evidence the child was a person described in section 300 and ordered her detained. The court also instructed DCFS to evaluate whether it would be appropriate to file an amended petition "on emotional abuse based on the . . . [child] evaluation" that had been submitted during the family court proceedings.

DCFS subsequently filed an amended petition alleging two additional counts under section 300, subdivision (c). Count (c)(1) alleged mother had "created a detrimental home environment for the child by emotionally abusing the child. Such emotional abuse consisted of, but is not limited to, subjecting the child to numerous interviews regarding possible abuse to the child by the child's father, . . . including sexual abuse and telling the child to give false and misleading information to [law enforcement and DCFS] employees about how the child is treated by child's father. . . . Such conduct places the child at substantial risk of suffering severe emotional harm."

Count (c)(2) alleged "the child . . . is a victim of an on going [sic] child custody dispute between the child's mother . . . and the child's father . . ., which includes, but is not limited to, the child's mother making continuing accusations that the father is abusing the child. Furthermore, this on-going [sic] custody dispute places the child at substantial risk of suffering serious emotional damage."

**B. *Summary of the Jurisdiction Report and the Family Court Child Evaluation***
  *1. DCFS's jurisdiction/disposition report*

On August 16, 2013, DCFS filed a "Jurisdiction/Disposition Report" that included a summary of the family's prior referral history. In December of 2000, DCFS received a referral alleging emotional abuse by both parents. The reporting party stated that law enforcement had responded to a domestic dispute during which "mother [had] bit father." The "house was in disarray" and the child had reportedly been "left unattended in a crib while the parents argued." Mother was arrested. The referral was investigated and found to be "inconclusive."

5

The second referral, received in March of 2004, also involved domestic violence and was found to be "inconclusive." The reporting party stated that the parents had been engaged in "domestic violence in the presence of the child . . . for the past three years," and that mother had alleged father previously "pushed, pinched and bitten the child." A third referral in June of 2004 involved allegations of sexual abuse against father. According to the referral, M.M. had reported that father took her into the bathroom during a monitored visit and "touched her vaginal area." The child also said she no longer wanted to see father. The referral was deemed to be unfounded. A fourth referral in July of 2006 alleged father had "locked the child in the bathroom," causing the child to "urinate[] on herself." The referral was deemed unfounded.

Finally, in April of 2013, DCFS received a fifth referral alleging M.M. told a counselor she did not want "visit with her father because she was allegedly sexually abused by him." The child told the reporter father had "inappropriately touched her underneath her skirt" and "forced her to stay in bed." The abuse allegedly occurred when the child was "6 to 10 years old." The referral also indicated M.M. had said she was afraid of father because he had previously hit her and threatened her life. DCFS described the disposition of the case as "evaluated out."

The jurisdiction report also summarized additional interviews the agency had conducted with M.M., father, mother and various other parties involved in the family's ongoing custody dispute. During an interview on August 9, 2013, M.M. told DCFS her father had been highly critical of her for as long as she could remember. The child reported that she and father had previously met with Albert Gibbs, the special master in the family court proceedings, to work on their issues. M.M. had a negative experience during those meetings because father would deny engaging in any wrongful conduct, blame mother for the situation and accuse the child of lying. M.M. made clear to DCFS she was not interested in any further therapy with father. She reported sharing a strong bond with mother, explaining that mother was her "best friend" and "underst[ood] her." M.M. also said she "believe[d] she ha[d] a stronger connection with mother because she . . . came out of her mother."

6

During a second interview conducted several days later, M.M. stated that father had "anger issues." The child described several instances when father had yelled at her over trivial issues. M.M. also claimed that when she was seven years old, she had witnessed father "physically grab" her paternal grandfather and throw him out of the house. When her grandfather tried to re-enter the premises, father took out a steak knife. M.M. also reported that she had seen father put his hands around her paternal grandmother's neck and that father and the paternal grandparents "typically yell and scream at each other."

M.M. claimed she never told mother about father's the sexual abuse "until the police showed up at mother's . . . home" while investigating the allegations described in the April 2013 referral. M.M. told DCFS that father's sexual abuse began when she was six years old, and continued until she was ten. According to the child, father had forced her to shower in his bathroom, "lather[ed] soap all over her body" and "sometimes" penetrated her anus or vagina with his fingers. The child also alleged that father had forced her onto his bed, where he fondled her breasts and vagina. The last such incident allegedly occurred in December of 2012.

M.M. recalled that the day before DCFS had detained her from her parents, the family court had "forced her to go live with [father]." M.M. alleged that later that evening, father tried to force her into the bathroom to perform "some sort of sexual or inappropriate touching." A physical struggle ensued, during which M.M. sustained scratches on her arms. The child woke up the next morning "resolved [not to] take any more abuse by the [father]," which is why she had "called the police." DCFS noted that throughout the interview, M.M. frequently went "off topic to point out that mother . . . is her best friend, and to discuss how much she and mother . . . love each other, etc." DCFS also reported the child "presented as anxious, . . . spoke rapid at times, held a small prayer book tightly against her chest and repeatedly stated 'nobody believes me.'"

During an interview on August 13, 2013, father told DCFS he and mother had been engaged in "custody issues in [f]amily . . . [c]ourt since January of 2004." At the time of their separation in 2004, father was only permitted monitored visitation with

M.M., who was then three-and-a-half years old. During that time period, mother accused him of "sexually abusing [the child] while he helped [her] wash [her] hands." Father stated that two monitors who were present when the abuse had allegedly occurred denied witnessing any such conduct. Father expressed frustration with the family court process, explaining that he could not understand why it had taken Nadene Jett (the child's appointed family court attorney) and Albert Gibbs (the family court special master) almost ten years to acknowledge mother was the "problem due to her efforts to alienate him."

Father reported that he obtained custody of M.M. in 2006, and that mother married Charles B. shortly thereafter. Father claimed he had a healthy relationship with M.M. "during the time period that mother . . . was married [to B.]." However, his relationship with M.M. "started to change" after mother separated from Charles B. in 2012. According to father, M.M. "began yelling at him without any restraint." Following his separation from mother, Charles B. contacted father and warned him that mother had "always talked about exacting revenge on [him]."

Father also described what had occurred during the days that preceded M.M.'s detention. After the family court awarded father temporary custody on July 22, he took M.M. to a court-ordered therapy session and then brought the child back to his house. The child "sobbed in a highly exaggerated manner" and then went to her bedroom. The child later watched a movie in father's bedroom. Father denied that he had engaged in a physical struggle with M.M. The next day father took her to a movie at a mall. During the movie, M.M. said she had to go to the bathroom and never returned. The police later found her at a store in the mall talking on a cell phone. When the child saw father and the police, she started to cry and refused to go with him.

Although father admitted he had "issues" he was attempting to address in individual therapy, he denied ever physically or sexually abusing the child. He believed mother's "parental alienation and . . . emotional instability [w]as the source of the [family] problems." Father also showed DCFS a video of M.M's recent bat mitzvah.

8

According to DCFS, the child appeared joyful in the video, and father "spoke with tenderness as he reminisced about the time he and [the child] had spent together."

During an interview on August 10, 2013, mother informed DCFS she had sought a restraining order against father in December of 2012. Mother explained that she and M.M. were at a restaurant with friends when father started calling the child. Mother instructed the child to "ignore the calls" and "enjoy her dinner." M.M. finally answered one of the calls and put father on speaker. Mother heard father "screaming and cursing." Another person attending the dinner took the phone from M.M. and began telling father he was acting inappropriately. Father got "very angry and made all sorts of threats" against mother and M.M.

After the incident, mother filed her application for a restraining order, which had "set in motion the current sequence of events." DCFS explained that, based on the evidence presented during the hearing on mother's application, the family court ordered a child evaluation. The evaluation concluded that mother had induced M.M. to make false allegations against father as part of an ongoing effort to alienate the child from her father. Mother asserted that the child evaluator, Jane Shatz, had "distorted" the witnesses' statements and only interviewed individuals who would support her "'junk science' theory of parental alienation." Mother asserted she was "contesting the evaluation," which she described as "very biased against her."

Mother claimed she did not know M.M. was a victim of sexual abuse until "law enforcement showed up at her home to interview [the child]" in the spring of 2013. Mother denied having played any role in the child's allegations. DCFS reported mother was "very emotionally shaken throughout the interview," and "had difficulty differentiating herself from [the child] and how much she loves [her child]."

DCFS also spoke with the deputy district attorney who had investigated the sexual abuse allegations M.M. made against father in April of 2013. The attorney stated that the case had been "rejected due to insufficient evidence," explaining that "the allegations were . . . investigated, there ha[d] been no new disclosures, and the [father] had been interviewed on multiple occasions regarding the allegations and . . . denied [them]." The

9

attorney also stated that when M.M. was interviewed about the allegations, she "went off on long tangents about mother . . . being the better parent . . . that . . . appeared to be scripted."

DCFS also spoke with Jane Shatz about the child evaluation she had prepared for the family court. Shatz asserted that mother's "parental alienation . . . had been going on for almost ten years." Shatz also informed DCFS she believed the current allegations of abuse were "all part of mother['s] efforts to alienate the [father]," which had been going on "for years." When asked "if she [had] considered" whether M.M.'s "anger" toward father was the result of prior abuse, Shatz responded that she "felt there was no foundation to [the child's] allegations."

In its assessment and evaluation of the child, DCFS reported that M.M. "present[d] as highly intelligent, mature beyond her years, and self assured when discussing her career and educational goals." However, when discussing the allegations of abuse, the child appeared to have "such an overwhelming fear of not being believed . . . that she tend[ed] to provide an overabundance of trivial details." When "redirected with follow up questions," the child was able to "provide a cohesive narrative about her history of trauma, abuse and neglect."

DCFS concluded that while the child's narrative was "coherent . . . in regard to her history of . . . abuse by [father], the entire process ha[d] been contaminated by her tangential anecdotes about mother . . . being the better parent and the poor timing of her disclosures." DCFS believed the parents' "long standing custody dispute" had caused M.M. to develop "insecure attachments with her parents as evidence by her extreme reactivity, hostility and disdain toward the [father], coupled with her unhealthy enmeshment with and lack of boundaries with mother." DCFS also found both parents lacked empathy for the child and lacked insight into the individual role they had played in the "current family situation." DCFS recommended that the court sustain the petition in its entirety and remove M.M. from parental custody.

### 2. *Summary of Jane Shatz's child evaluation*

DCFS provided a copy of the 106-page child evaluation Jane Shatz had prepared for the family court. Shatz submitted the evaluation to the family court on July 10, 2013, two weeks before M.M. had been detained from the parents in the current dependency proceeding.

During the course of her evaluation, Shatz interviewed M.M. and father individually and in a joint session. She also interviewed mother, the paternal grandparents, father's former fiancé M.O. and numerous other friends and family members. Shatz also interviewed several professionals who had provided services to the family during their custody dispute, including Nadene Jett (M.M.'s former counsel), Al Gibbs (the former special master in the family court proceedings), Lynn Steinberg (father's therapist), Payam Kade (mother's therapist) and Catrien Vilami (the child's former therapist).

### a. *Background information*

Shatz's evaluation provided a detailed summary of the family's history. Mother and father were married in 1996; M.M. was born in 2000. The parents' marriage was "marked by intense, daily conflict." In 2000, mother was arrested and convicted "on domestic violence charges" after she "bit [father] during a fight." In 2003, father was "arrested and convicted of domestic violence" after he allegedly bit mother. The parents separated in January of 2004. Mother was awarded sole custody of M.M., and father was permitted monitored visitation. The family court assigned Nadene Jett to represent M.M., which she continued to do until 2007.

In June of 2004, father's visits were temporarily suspended after M.M., then four years old, accused him of inappropriate sexual touching. Father asserted mother had coached M.M. to make the false allegation. Two monitors who were present when the touching allegedly occurred denied witnessing any abuse. Father's visits were restored, with all monitoring requirements lifted in 2005.

In 2006, the family court "shifted custody to an 80-20 split favoring [father]" after discovering mother had misrepresented the amount of time she was spending outside of California. In 2007, the parents agreed to an equal custody share. That same year, mother married Charles B., whom she lived with until their separation in 2012. According to Albert Gibbs and Nadene Jett, the parents' relationship was relatively stable while mother "was married [to B.] and then escalated again after the separation."

The incident that led to Shatz's child evaluation occurred in December of 2012. During a phone call with M.M., father lost his temper and started "scream[ing] at her for not answering his calls for two days." Mother filed an application for a restraining order claiming that father had repeatedly threatened to kill her and M.M. during the incident. At the subsequent hearing, M.M. and mother made numerous claims against father, asserting (in part) that he watched pornography in front of M.M., routinely forced her to drink alcohol and regularly drove in the car with her while intoxicated. The family court judge found their testimony not credible, explaining "the child's viewpoint [may have been] been colored by parental alienation by the [mother], and I think we need to get to the bottom of that. And I think if that is the case, it will have consequences." The court also found that while there was evidence father yelled and used vulgarity, there was no evidence he was a threat to mother's life or well-being. The court denied the application for a restraining order and ordered the child evaluation.

### b. *Summary of interviews with family members*

Father told Shatz he believed mother had waged a "campaign to marginalize him as a parent and alienate him from [M.M.]." He claimed mother had engaged in increasingly alienating behavior, which included ordering the child not to look at him, tearing up photographs of him in the child's presence and disparaging the paternal grandparents. Father also believe mother had "long coached their daughter in things to say that will portray him in the most negative light possible." Father asserted that mother frequently overreacted to situations, was "highly controlling" of M.M. and "always hampered contact" with the child.

Father acknowledged he had "several clashes" with mother that "became physical." He also acknowledged that he became "severely anxious" when he was unable to contact M.M. He denied, however, ever threatening to kill anyone or abusing the child in any way. Father reported that the family court hearing on mother's application for a restraining order had "complete[ly] changed his daughter," who would no longer speak to him. He also reported that M.M. had a significant history of problems in school, including "spitting at others, pulling her hair when distressed [and] striking herself."

Mother described father as an "intensely controlling individual with a long history of domestic violence" and alcoholism. Mother claimed he frequently became violent over trivial matters, and that she had "lost a lot of brain cells" as the result of his physical abuse. She also accused father of making "overt death threats" toward herself and M.M. during the 2012 incident and on various other occasions. Mother asserted that father had "created a real climate of real fear for [M.M.]," and that his "grim temperament" had frequently endangered the child. In support of these allegations, mother produced pictures showing bruises and scratches on the child's legs that Shatz described as "decidedly minor and superficial in nature." Mother also claimed father had "shown indifference" to M.M.'s past health problems and did not support her extracurricular interests. Mother asserted all of this conduct had caused M.M. not to want to see her father.

When Shatz raised father's concerns about mother's alienating behavior, mother stated that father had "brought this on himself with such malevolent conduct as threatening his daughter's life." Mother claimed she had repeatedly encouraged M.M. to visit with father, but the child refused because she was scared of him.

When asked to assess her strengths and weaknesses as a parent, mother stated that she provided M.M. "unconditional love," and was "understanding[,] . . . attentive, patient, confident, honest, kind, loving and caring." She described her weaknesses as "offering [M.M.] too much help and sympathy," being "overly sensitive" and failing to "take time for herself." Mother was unable to cite any strengths that father had as a parent, asserting

13

only that he knew "how to mask and control his emotions." He was otherwise dishonest, manipulative, disrespectful and violent toward the family.

M.M. informed Shatz she only had "bits and pieces of memories" from when she was young, but recalled that father always had "horrible anger issues." M.M. claimed father had kicked her and mother out of the house when she was three years old. For the last six years, M.M. had split time between father and mother's residences. The child claimed her room in mother's house was sanitary and gave her an "'upbeat feeling.'" In contrast, she reported that her room in father's house was "disgusting," "dusty" and "moldy" with "no light." M.M. claimed she was "terrified" when she stayed with father because he was always yelling at the paternal grandparents and nearly "killed [them] in front of her." M.M. also claimed father had "kicked her a couple of times."

When Shatz asked M.M. about the sexual abuse allegations she had made in April of 2013, the child responded that the abuse occurred "every weekend" and "had been going on for as long as she could remember." When asked what father had done to her, M.M. reported that he "snap[ped] her bra"; "hit her behind"; "put his hands on her thigh [while] at the dinner table"; "put his hands under her clothing"; and forced her to "come into his bed." When asked to provide more specific details, M.M. said that between the ages of six and twelve, father had put his leg over her while in his bed, and then put his hand under her bra and underwear. He repeated this "approximately twice every weekend." M.M. reported that she had always wanted to tell someone about the sexual abuse, and that she "was sure that if the [paternal] grandparents knew, they would have stopped it." The child claimed, however, that father had threatened to kill family members if she ever told anyone.

M.M. also reported that that during this same six-year period, father frequently beat himself in the chest until he bled, foamed at the mouth and beat the paternal grandparents. When asked how frequently father was "physically abusive," M.M. said "[m]ost days, most nights." She also reported that father had a "smile on his face after hitting her." M.M. denied ever having an "happy times" or "positive interactions" with father.

14

When Shatz informed M.M. she wanted to conduct a conjoint session with father, the child initially refused to attend. After consulting with mother, M.M. agreed to participate. During the two-hour session, M.M. told father that if she ever looked happy in his presence it was only because she was "pretending." She denied ever being affectionate toward him. She also accused him of sexually abusing her, forcing her to drink alcohol on about 10 occasions and beating his own parents every day. Father asked M.M. why she had never told anyone this information before now.

After M.M. left the room, "father became very upset." Father explained that if he thought it was the right thing to do for the child, he would "walk away" because he knew mother would never stop making allegations against him and placing M.M. in the middle of their dispute.

### c. *Summary of interviews with professionals who worked with the family*

Nadene Jett informed Shatz she had served as M.M.'s family court counsel between 2004 and 2007. Jett stated that during that time, mother had "indulge[d] in histrionics"; "frequently fail[ed] to tell the truth"; and "was very demanding."

Jett reported that "the first sexual abuse allegation by [mother] was made in 2004 following a visit with [father]." Mother asserted that father had sexually abused M.M. when the child went to the bathroom at father's house. Jett explained that unbeknownst to mother, Jett and another monitor were at father's home when the abuse allegedly occurred and could see into the bathroom where M.M. had gone. According to Jett, the abuse "plain did not happen" and that she "knew [mother] was lying." Jett also stated mother was "in trouble constantly with these kinds of false allegations," which ranged from accusing father of not feeding the child properly to sexual abuse. Jett believed mother was "emotionally unstable" and "enmeshed" with the child. Jett also explained that M.M. had previously displayed affection toward father, and had appeared to be "well adjusted and relaxed" in his presence. According to Jett, in her last meeting with father and M.M., which occurred in 2008, she "observed a normal father/daughter relationship."

15

Al Gibbs, who served as the special master and parent-plan coordinator from March 2010 to March 2012, "described [mother] as a steeply narcissistic individual with a poor sense of boundaries, and . . . prone to histrionics that ha[d] undoubtedly worsened the conflict. She was also found not to be truthful. [Gibbs] assessment of [mother] [wa]s that she basically wanted [father] out of [the child's] life and was unwilling to work cooperatively with [father] in any way." Gibbs asserted that mother put "pressure" on M.M. and had "always wanted to cut off visitation with father."

Gibbs described father as "demanding and a screamer." Gibbs also stated that the entire family was "very high maintenance," explaining that mother was "someone who will 'go off about anything that happens'" and that "[w]hen [father] feels slighted, he goes on tirades," "screams" and "gets verbally abusive tow[ard] mother and violent." Although Gibbs believed things were difficult for M.M. at father's home, he believed the "emotional distress[]" she experienced at "mother's [home was] significantly worse." He also believed both parents had "borderline personality disorder."

Father's individual therapist, Lynn Steinberg, told Shatz father had a tendency to get "impulsive" and "angry," which he "regret[ted]." Steinberg noted that father was aware of his issues, and working to find "better ways to express his angry feelings." Payam Kade, a therapist who met with mother approximately 15 times in 2013, told Shatz that mother exhibited symptoms of "histrionic personality" and tended to "exaggerate[] things." Kade also reported that mother "d[id] not see her role in anything," and that M.M. was "affected by" mother's "anxiety." Kade did believe, however, that mother had been "a victim of abuse for a while."

Catrien Vilamil, who served as M.M.'s therapist from 2006 to 2009, informed Shatz that mother was "very inquisitive about every detail that occurred during her time at her father's [house]." Vilamil found mother to be "manipulative and evasive," explaining that she "would always do the opposite of what father wanted." Although mother told Vilamil that M.M. was afraid of her father, Vilamil had never observed the child behave in such a way. On one occasion, M.M. told Vilamil she was afraid of mother because mother had screamed that father was "'a dog.'" M.M. also told Vilamil

16

mother "lied in court and was not being truthful." Vilamil believed M.M. was "constantly being pulled in one direction," explaining that "after children hear these things over and over, they start to believe them."

Vilamil described father as "honest, [with] his main focus . . . on [the child]." Mother, on the other hand, attempted to "intimidate and manipulate" the child. Vilamil got the "sense [that M.M.] could not say anything positive to mom about her father." When Shatz asked whether she believed father had physically abused mother, Vilamil responded "that it was hard to believe or know what is true because the relationship is so bad." Vilamil "believed [mother had] continually manipulated [M.M.]," and that her "goal was to alienate [M.M.] from father."

### d. Shatz's assessment and evaluation

In her assessment and evaluation, Shatz stated: "This is . . . the most outrageous case I've evaluated in my 19 years as an evaluator in terms of mother's willingness to make up stories about absolutely everything[.] Results of this evaluation show a disturbing pattern of chronic sabotage, undermining, marginalizing and destructiveness that I've ever seen, all the while playing the victim. [Sic.] Seldom do I see a case that is so one-sided, but findings of this evaluation indicate that [mother] has used every opportunity at her disposal to attempt to destroy the relationship that [father] has with their daughter." Shatz further concluded that mother had "routinely made false allegations against [father]," and that "almost all of [her] statements . . . in her clinical interviews had little bearing on reality. . . . It appears that . . . . [mother] has been willing to say absolutely anything she can to destroy the relationship between father and daughter."

Shatz found that "in addition to the mistruths, [mother] ha[d] acted in irrational and aggressive ways to[ward] [M.M.] if she felt slighted in any way compared to her father, and would become angry at [the child]." Shatz noted that during an earlier child custody evaluation, M.M. had told the evaluator "'her mother puts pressure on her to tell her 'all the bad things about her father' and that mother [s]ay[s] bad stuff about her father

17

that makes [the child] believe bad things will happen to her. . . . She also told the evaluator that her father is trying to 'destroy her life' because he has been 'ruining my life from the beginning' and that he hit her mother in the stomach when she was pregnant."

Shatz expressed concerns about mother's mental health and believed it would be "detrimental to [M.M.]" to continue the "shared custody arrangement between her parents." Shatz felt the current parenting plan had made the custody dispute worse, which had affected M.M.'s academic performance. According to Shatz, M.M. was "not thriving in mother's care. It is not good for her to be in an environment where there is such pressure on her to reject her father, and to listen to her mother's rantings and observe mother's antics toward her father." Shatz recommended that mother be barred from having contact with the child for 90 days and that father and child "attend a therapeutic reunification program." The family court accepted Shatz's findings and followed her recommendations.

DCFS social worker Mercedes Mendoza, however, filed a last minute information asserting that she had concerns regarding Shatz's evaluation. In Mendoza's view, Shatz did not adequately consider statements and evidence indicating that father had difficulty managing his anger and had repeatedly used physical force against the child.

### 3. Additional documents filed prior to the jurisdiction hearing

#### a. Last minute information dated September 11, 2013

On August 29, M.M. contacted DCFS to report she was "very emotionally shaken and tearful." The child reported that while her current foster parents were "very kind people," she missed her "home life with mother." She reported feeling like she was being punished for "not wanting to continue to endure further abuse by the . . . father."

The last minute information also indicated M.M. had seen father drive by her foster home on September 4, 2013. Later that evening, she saw father and paternal grandfather outside the foster home. The foster parents confirmed they had seen father walk by the house, and that the child appeared scared when she saw him. The foster

parents informed DCFS they did "not understand where the notion comes from that [M.M.] is a 'brat' and is being unreasonably angry at the [father].'" They also reported that M.M. was "highly adaptable" and had successfully complied with all of the rules that had been set in the foster home.

### b. *The MAT report*

On October 10, 2013, DCFS provided a report summarizing the results of the MAT assessment it had conducted in September and October. DCFS reported that M.M. still wanted to return to mother's home, and did not want any contact with father. According to the DCFS evaluators, M.M. was "engaged in the process, talkative, made excellent eye contact and had no difficulty expressing her feelings." M.M. had stated that "she ruminates during the evening and 'breaks down and cries at least once a day at school' over her situation and separation from her mother. She is tentatively mistrustful of therapists, expressing that she has felt lied to, particularly in a conjoined setting wither father." She also remained adamant that she would not participate in conjoint therapy with father.

The foster parents informed DCFS that M.M. was attending school and exhibiting "no behavioral difficulties." During her most recent visit with her therapist, M.M. described herself as "'nervous 'that the case has been dragging' and stated that she missed her mother." DCFS reported that the child was cooperative, exhibited no problems in her "gross and fine motor skills," appeared "well spoken" and had "no difficulty speaking for herself. M.M. had no complaints about her foster home placement, other than the absence of her mother. She admitted, however, that she had recently received Cs, Ds, and Fs in school, explaining that her grades had "suffer[ed]" because she "'ha[d] a lot on [her] mind.'"

### C. *Jurisdictional Hearing*

In October of 2013, the juvenile court began the jurisdictional hearing, which continued over an 11-month period. During the course of the hearing, the court admitted numerous documents into evidence, including Jane Shatz's child evaluation, the detention

report, the jurisdiction/disposition report and each of DCFS's last minute informations. The court also admitted materials from the family court proceedings, including mother's application for a restraining order, various materials filed in support of the application and a transcript of the family court hearing regarding her application.

### 1. *Initial testimony of M.M.*

M.M. testified several different times throughout the jurisdiction hearing. During testimony in October and November of 2013 and April of 2014, M.M. provided information about father's alleged physical and sexual abuse. M.M. stated that on the morning after the family court had awarded him temporary custody, father had slapped her in the face and scratched her on her arms. Father had inflicted the scratches while trying to drag M.M. into his bedroom. M.M. testified father had slapped her on five to ten prior occasions, beginning when she was seven or eight years old. She also alleged father had kicked her on two to five occasions. According to M.M., father was always angry at her and never displayed any kindness toward her.

M.M. also testified that father had digitally penetrated her vagina "every time she went to the shower," and that she expected to be abused "pretty much every time she took a shower." M.M. stated she was five or six years old when the sexual abuse began, which initially consisted of father climbing on top of her in his bed and putting his hands under her clothing and underwear. M.M. alleged this occurred "every time [she] was in his custody," and that he got an erection when he touched her. The abuse continued until she was about twelve. M.M. claimed that she never told her mother about the sexual abuse.

M.M. testified she could not recall a single occasion on which her mother had said anything negative about her father, and denied that mother ever asked her questions about what she had done when she was with father. The child also stated that she could not think of a single positive thing about her relationship with father, and could not think of a single negative thing about her relationship with mother. M.M. denied having any relationship with father's former fiancé, M.O., or her paternal grandparents.

20

When questioned about the day she had been detained from father, M.M. explained that she "had a feeling something was going to happen" when she went to the movie theater and decided to bring the "flip-phone" her mother had given her "in case of emergencies." She admitted that she had called mother's attorney after leaving the theater, but could not recall why. M.M. explained that the $120 in cash found in her clothing was money she had received from "doing sitting" or from her bat mitzvah. M.M. admitted she was upset when the family court awarded father temporary custody, explaining that she did not want anything to do with him.

M.M. also testified she had not fabricated or exaggerated any of the allegations against father. M.M. stated that she never told her paternal grandparents about father's sexual abuse because she believed they "would not care." When questioned about language in Shatz's evaluation indicating that M.M. had said she was sure the paternal grandparents would have stopped the abuse if they knew about it, M.M. denied ever making such a statement. M.M. also admitted that during a prior family court hearing, she had testified that father never slapped her in the face. She also admitted that during a police interview on May 4, 2013, she had told investigators she could not recall any instance in which father had penetrated her vagina, and had not mentioned that father's penis became erect when he touched her. M.M. denied ever telling therapist Catrien Vilamil she was afraid of mother, or that mother had had made negative statements about father.

### 2. Testimony of DCFS social worker Mercedes Mendoza

DCFS social worker Mercedes Mendoza, the author of the agency's jurisdiction report, testified that that she had witnessed M.M. display symptoms of "extreme anxiety" before attending court meetings or interviews about the abuse allegations, which included not eating, not sleeping and vomiting. Mercedes also testified that, standing alone, she did not believe the scratches on M.M.'s arms in July of 2013 would warrant an allegation of physical abuse.

21

Mendoza did not believe mother had caused, or was attempting to cause, any alienation between M.M. and father. Mendoza found M.M.'s sexual abuse allegations to be credible, explaining that the child had "consistently provided . . . a cohesive, reliable narrative about the abuse." Mendoza admitted that the abuse had not been corroborated by any percipient witness or medical evidence. Mendoza also admitted she was aware DCFS's detention report, which was written by a different social worker, stated that M.M. had said she immediately told her mother about father's sexual abuse each time it had occurred. Mendoza acknowledged this information contradicted statements M.M. had made to her, in which the child had denied ever telling mother about the sexual abuse. Mendoza further testified that she never attempted to contact the DCFS social worker who wrote the detention report.

Mendoza also admitted she did not interview any of the following persons during her investigation: Catrien Vilamil (the child's former therapist); Charles B. (mother's former husband); M.O. (father's former fiancé); Albert Gibbs (the family court special master), father's therapist or mother's therapist. Mendoza also admitted she did not investigate whether mother had "borderline personality disorder."

Mendoza also testified that the numerous inconsistencies in M.M.'s testimony did not affect Mendoza's opinion regarding the child's credibility. Nor did the fact that a deputy district attorney believed the child's answers to questions regarding father's alleged abuse appeared to be "scripted."

### 3. *Mother's testimony*

Mother testified that she had seen father "physically hurt" M.M. on eight to ten occasions, throw objects at the child and "tear off" her clothes "several times." Mother also testified that she had filed an application for a restraining order in January of 2013 after hearing a phone call during which father threatened to kill her and M.M. Mother confirmed she had filed a declaration in support of the application asserting that M.M. was suffering "emotional distress" from father's threats, which included inability to

sleep, stomach aches, pulling her own hair and feeling "petrified." Mother admitted that despite these alleged symptoms, she did not take M.M. to a doctor or therapist.

Mother also stated she had no knowledge of father's sexual abuse until the police came to her door in May of 2013. Mother testified that although she believed father to be emotionally abusive, she had never suspected he physically or sexually abused the child.

Mother testified that when M.M. was informed the family court had ordered temporary custody to father in July of 2013, the child had a "horrible" reaction that included an "asthma attack" and "crying for help." Mother saw M.M. exhibit similar signs of anxiety whenever it was "time to visit with father," which normally involved "asthma and aspiration." Mother denied ever telling M.M. to provide false information to DCFS or the police, and denied any responsibility for shaping the child's attitudes toward her father.

Mother admitted that after the family court denied her application for a restraining order, she and father were each ordered to recommend the name of a therapist to conduct the child evaluation. Mother had recommended Jane Shatz, whom she met with for approximately eight hours during the evaluation. Mother described Shatz's evaluation as "twisted" and "bizarre." Mother asserted that Shatz had misrepresented "every single statement," and that father must have bribed her.

### 4. Testimony of Charles B.

Charles B. testified that he lived with mother from 2007 until they separated in October of 2012. Charles B. stated that M.M. was frequently unhappy when she returned from her visits with father because "she would get bored." Charles B. explained there was not "much [for M.M.] to do" at father's house because he was "observant" of orthodox Judaism. Father also yelled at her for failing to follow his religious restrictions. Charles B. stated that M.M. did enjoy hiking with her father, and sometimes returned from her visits seeming happy.

Charles B. testified that "it was tough" for M.M. when she returned from her visits with father because mother would subject her to "a lot of questioning" about what they

23

had done.  According to Charles B., mother's incessant questioning caused the child anxiety "because it was [kind of like an] inquisition.  It was nonstop questioning and looking – it felt like [mother] was looking for some slip-up. . . ."  Charles B. explained that M.M. had to be careful in choosing her answers because "when you give the wrong answer to [mother], she can be relentless . . . .When you say something, she can take things and twist them in a way that you don't really mean.  And [the child] had to be very careful."

Charles B. testified that after his divorce from mother, he contacted father to "set the record straight" about why they had separated.  Charles B. explained that he had contacted father because he was concerned mother would tell M.M. to "tell her father lies about" the circumstances of the separation.  When asked why he believed mother would tell M.M. to lie, Charles B. responded:  "Because that's what [mother] does. She tells [M.M.] to lie."  Charles B. also stated that M.M. was "carrying a lot [and] protecting a lot; protecting more than any child should ever have to protect."  When asked to clarify this statement, Charles B. said M.M. was "protecting her [mother] from the world [because that]  . . . is what she's been raised to do."

Charles B. also testified that mother made negative comments to M.M. about father, telling the child that father did not love her and treated her "like a possession."  Charles B. believed mother's comments put "a lot" on the child and had "really discourage[d]" the relationship with father.  Charles B. also reported that mother said a "myriad of things" to M.M. about her marriage to father, telling the child "[he] used to come at me.  He used to beat me.  He used to hit me in the stomach when I was pregnant with you.  He only let me eat peanut butter when I was pregnant with you.  He would come after me with a knife."  Mother also disciplined M.M. by saying things like "if you don't do what I'm going to tell you to do, it means you don't love me . . . anymore.  It means that I am second.  It means that I'm not important to you."  Charles B. never saw mother do anything to encourage the relationship between M.M. and father.

Charles B. believed that over the course of the family court proceedings, mother had become more aggressive than father.  Charles B. also testified that mother had

24

expressed concern to him "a few years ago" that father was sexually abusing M.M. Charles B. and mother decided to discuss the issue with the child, who denied any abuse.

### 5. Testimony of father's family members

The paternal grandfather testified that he and M.M. had previously had an affectionate relationship and frequently did things together. He stated that father and M.M. had also shared a good relationship. He never saw father physically abuse M.M., never heard him threaten to kill mother or M.M., never saw father drunk and never saw father act in a violent manner. The paternal grandfather did admit, however, that father had a tendency to get angry. The paternal grandmother provided similar testimony, explaining that M.M. had previously had a good relationship with both father and paternal grandfather. The paternal grandmother noticed that the child began to become more withdrawn at some point in 2012.

M.O., who was engaged to father in 2010 and remained his close friend, testified that she was a child educator with 25 years experience in childhood education and training, which included issues related to child abuse. M.O. stated that she and her two daughters had spent a significant amount of time with father and M.M. between 2008 and 2013. For many of those years, M.M. appeared to be a "bubbly," "giddy" "happy girl." However, beginning in late 2012, M.O. noticed a significant change in the child's demeanor. M.M. stopped talking to M.O., did not want to eat at M.O.'s house and refused to sit in the front seat of the car. M.O. also stated that the child appeared nervous whenever father picked her up from mother's house.

M.O. described numerous instances when mother had engaged in aggressive or erratic behavior in the child's presence. M.O. described various examples of mother's erratic behavior, which included screaming at father during a school open house, refusing to allow M.M. to enter her home to retrieve a father's day gift and contacting the police over a custody scheduling issue. M.O. also testified that she had attended the family court hearing on mother's application for a restraining order. During the proceedings,

mother's family acted abusively toward M.O., calling her a "whore, a prostitute and a liar."

M.O. did not see father engage in any form of abuse toward M.M., never saw him drunk and never suspected that the child was the victim of abuse.

### 6. *M.M.'s additional testimony*

M.M. was called to provide further testimony after Charles B., the paternal grandparents and M.O. had completed their testimony. M.M. admitted she had cried while Charles B. and the paternal grandmother were testifying. M.M. asserted that Charles B. had lied on the stand, and that that she had started crying because he used to be her father figure but left her house "without saying goodbye." M.M. could not explain why she cried during her grandmother's testimony, but stated that she did not believe the paternal grandparents or M.O. ever loved her. She alleged that father's family used to "talk trash" about mother, but that mother never said anything negative about anyone in father's family.

### 7. *Father's testimony*

Father testified that his marriage to mother had been volatile and that he engaged in some conduct he regretted. Father stated that he had completed a domestic violence class approximately 10 years ago and been attending individual therapy ever since. He admitted having difficulty managing his anger, which was an issue he continued to address in therapy. He also admitted that he "totally lost it" while talking to his daughter on the telephone in December of 2012. Father explained that he had been upset because M.M. was refusing to answer or return his calls. When M.M. finally answered her phone, a person interrupted their conversation and began telling him he was a bad parent, which caused father to raise his voice. Father took "some responsibility" for his ongoing dispute with mother, and believed "there must have been" instances in which he spoke negatively of her in front of M.M.

Father said he started to notice M.M.'s behavior change in the fall of 2012. Prior to that time, the child had told him about her life, her school and her friends. She also

participated in many activities with him, including watching movies and going on hikes. She showed affection toward him, and shared close relationships with the paternal grandparents and M.O. Toward the end of 2012, however, M.M. started acting distant, cold and disrespectful toward father and his family.

Father believed mother was responsible for the change in M.M.'s behavior, which began around the time mother had separated from Charles B. and Albert Gibbs had stopped participating in the family court proceedings. Father explained that Charles B. and Gibbs had been stabilizing forces in mother's life; "with those two factors gone," mother started to engaged in the same type of behaviors that led to their separation in 2004. Father believed mother had influenced M.M. to make false allegations against him, and had caused the breakdown in his relationship with the child.

Father denied that he had ever sexually abused M.M., denied ever slapping her, denied forcing her to drink alcohol, denied driving while intoxicated with her in the car and denied ever threatening to kill anyone, including mother or M.M. Father also testified that he did not know Jane Shatz prior to the family court proceedings, and that mother had provided Shatz's name to the family court.

### 8. *Testimony of Jane Shatz*

Jane Shatz testified that "parent alienation" was one of her areas of expertise. Shatz described several types of behavior that typically occurred in alienation cases, which included "not giving the child permission to have any kind of relationship with the other parent"; "being angry at the child if she . . . display[ed] any loving or kind behaviors toward the other person"; and "talking about the other parent in a negative light." Shatz believed mother had engaged in a wide variety of behavior that qualified as alienation, including (in part) falsifying allegations of physical and sexual abuse, saying negative things about father in the child's presence and constantly questioning the child about what she had done with father.

Shatz testified that she believed M.M. had previously had a close relationship with father, M.O. and the paternal grandparents. Shatz concluded mother had "brainwashed

[M.M.] . . . to not like her father," and become "enmeshed" with the child, meaning she had no identity independent of M.M. Shatz also believed mother's conduct was symptomatic of histrionic personality.

Shatz asserted that M.M.'s sexual abuse allegations did "not comport with any type of reality." Shatz believed that although father had "an anger problem," he was not violent. Shatz also agreed with father's theory that mother's separation from Charles B. and Gibbs's withdrawal as special master were factors that caused things to "blow up" in 2012.

Shatz also expressed concern for M.M.'s well-being, explaining that it would be "very detrimental to [the child's] mental health in the future if something doesn't change. . . . She needs to understand what has happened to her." Shatz recommended that father and child participate in intensive conjoint therapy so that M.M. could "make sense of what's going on with her life." Shatz also testified that mother's alienation placed M.M. at "risk of serious emotional harm," noting that the child already exhibited "signs of severe anxiety" when she was forced to be in father's presence. Shatz did not believe the child was at risk of physical or sexual abuse by father.

Shatz also stated that in cases of severe alienation, there should "be no contact with the alienating parent for a period of time . . ." Shatz explained that mother had been alienating M.M. "throughout her life," and that such conduct would "likely . . .continue until [mother] gets some real help . . . so that she understands that she cannot do those things anymore."

### 9. Testimony of Payam Kade

Payam Kade testified that she was a licensed therapist who worked as a supervisor at DCFS and also maintained a private practice. Kade began meeting with mother after the family court had denied her application for a restraining order. Kade stated that she had worked on over 200 cases that involved "parental alienation," which she defined to mean "when a parent tries to do everything they can to keep a child from having a normal relationship with the other parent." Kade also testified that parental alienation can occur

28

when one parent behaves in a violent, angry or controlling manner, causing the child to seek out the other parent.

In her 18-year career, Kade had never seen a case in which alienation was caused solely by one parent's efforts to encourage a child to withdraw from the other parent. In every case she had worked on, both parents' conduct had contributed to the alienation. Kade testified that based on her discussions with mother and her review of Shatz's evaluation, she believed father's conduct had contributed to the child's rejection of him. Kade did believe, however, that causing a child to make false allegations against another parent constituted a form of emotional damage and abuse. Kade also expressed concern that placing M.M. with father, or forcing the child to attend conjoint therapy with him, might make her situation worse. Kade recommended the parents begin by attending conjoint counseling without the child present.

Kade admitted that, other than mother, she had not spoken to anyone that Shatz interviewed as part of the child evaluation. Kade also stated she was "quite certain" that Shatz was in a better position to form an opinion about what had occurred within the family.

### 10. Summary of additional last minute informations filed during the jurisdictional hearing

Throughout the 11-month hearing, DCFS filed several additional last minute informations. On December 16, 2013, DCFS provided an information stating that a school counselor had reported M.M. was performing poorly in school. According to the counselor, the child's "struggles" were "due to absences related to [c]ourt appearances, the constant back and forth between her parents, and the emotional toll the current situation [wa]s taking on her." The counselor further reported that although the child appeared happy and strong when she was with her friends, she became "tearful" when discussing the allegations against father. The child was reported to be well liked by teachers and classmates, and had never been associated with making false allegations against anyone.

On May 16, 2014, DCFS filed a last minute information reporting that M.M.'s therapist said the child was not ready to begin conjoint therapy with father or be in the same room with him, explaining that she is "afraid of him" and has been "emotionally exhaust[ed]" as a result of the court proceedings. DCFS also reported that the LAPD had conducted a follow-up investigation regarding the sexual abuse allegations M.M. had made in July of 2013. An LAPD officer reported the case was "rejected" by the district attorney because the "extensive history with the family law court[,] [the] conflict between the parents and the questionable nature of [the child's injuries], coupled with the planning and preparation by [the child] at the time she contacted the police, create[d] a reasonable doubt."

In a last minute information dated July 21, 2014, DCFS notified the court that it had scheduled a conjoint therapy session between father and child on July 23, 2014. When M.M. was notified that the session had been scheduled, she told DCFS she did not want to attend because seeing her father caused her to feel "stressed, depressed, having anxiety [sic] . . . and so many other things."

### D. The Juvenile Court's Jurisdiction and Disposition Orders

At the conclusion of the jurisdiction hearing, the trial court dismissed all of the counts that alleged father had physically and sexually abused the child. However, the court sustained as true two amended counts under section 300, subdivision (c). As amended, the sustained (c)(1) allegation stated that mother had "created a detrimental home environment for the child and intentionally alienated the child from the child's father . . . by causing the child to testify falsely, and to state to law enforcement and [DCFS employees], that the father physically and sexually abused the child on July 22, 2013 and over the preceding seven years. Such conduct . . . has caused and threatens to continue to cau[]se the child severe emotional distress and psychological injury, as evidenced by the child's severe depression, anxiety and withdrawal from the father and anyone associated with father."

30

The amended (c)(2) count, sustained against both parents, stated that mother and father had "enmeshed the child in an ongoing child custody dispute with neither placing the interests of the child above their own and neither honestly examining conduct of their own which has caused the child severe emotional distress and psychological injury, as evidenced by the child's severe depression, anxiety and withdrawal from the father and anyone associated with father."

The court also found "by clear and convincing evidence pursuant to section 361(c)" that returning M.M. to either of the parents would present a substantial danger to the child's well-being, and that there were no reasonable means to protect the child other than through removal.

The court provided a statement of decision in support of its ruling. On the dismissed counts alleging physical and sexual abuse against father, the court concluded that M.M. and mother were not credible witnesses. In support, the court explained that: (1) M.M.'s current claim of sexual abuse was "entirely inconsistent with" her testimony at the family court hearing in January of 2013, during which she had made no reference to any form of sexual abuse; (2) M.M. made inconsistent statements to DCFS about whether she had informed mother of the alleged sexual abuse; (3) although mother denied asking M.M. about her visits with father, several credible witnesses reported that mother "grilled [the child] exhaustively" about her activities with father; and (4) the family court had previously found M.M. and mother's claims that father physically abused the child to be not credible.

On the sustained subdivision (c) counts, the court found there was no "reasonable dispute" that M.M. had been alienated from father and that this alienation had been "principally caused by mother." The court explained that the child evaluation and the testimony of several witnesses showed M.M.'s claim she had never had positive relationships with father or any of the people associated with him had "no basis in reality." The court concluded that "[M.M.'s] rejection of every person in her life other than mother and her mother's family c[ould] only be the result of a serious emotional disturbance that will affect her all her life if . . . not addressed."

31

The court also found that, separate and apart from mother's alienation, the evidence showed "the inability of mother and father to resolve their custody battles and their failure to examine their own conduct and the emotional distress this conduct causes [the child] is injuring and threatens to continue to injure [the child]. There is credible evidence that there has been alienating behavior not only from mother and father but also from their families."

On the issue of disposition, the court explained that it was "guided by the testimony of Doctor Shatz and . . . Doctor Kade." The court found it was not currently in M.M.'s best interests to be released to father or mother. Instead, the court concluded M.M. would be best served by "immediately" meeting with a therapist who could help the child prepare to participate in joint therapy with father."[2]

## DISCUSSION

### A. The Trial Court's Jurisdictional Order Is Supported by Substantial Evidence

Mother argues there was insufficient evidence to support the juvenile court's jurisdictional finding that M.M. is a person described under section 300, subdivision (c). We review the juvenile court's jurisdiction findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433 (*J.K.*); *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) Under this standard of review, we determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of the determination and indulging all legitimate inferences to uphold the lower court's ruling. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212; *In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.) If there is substantial evidence

---

**2**     On this court's own motion, we take judicial notice of the minute orders entered by the juvenile court in this matter since mother filed her appeal. (Evid. Code §§ 452, subd. (d), 459, subd. (a).) These subsequent minute orders indicate that M.M. remains a dependent child and that the placement order remains in effect. The court has, however, permitted the child to return to mother's home for an extended visit, and ordered father and the child to participate in conjoint therapy.

to support the juvenile court's order, we must uphold the order even if other evidence would support a contrary conclusion. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

Section 300, subdivision (c) provides the juvenile court jurisdiction over any child who is "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . ." To establish jurisdiction under subdivision (c), the petitioner must "prove three things: (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557 (*Alexander K.*); see also *In re Brison* (2000) 81 Cal.App.4th 1373, 1379.)

In this case, the juvenile court found mother's "offending parental conduct" consisted of creating a detrimental home environment and intentionally alienating M.M. from father by (among other things) causing the child to falsely accuse him of physical and sexual abuse. The court also found mother's conduct "caused and threatens to continue to ca[u]se the child severe emotional distress and psychological injury, as evidenced by the child's . . . depression, anxiety and withdrawal from father and anyone associated with father." Mother does not assert there was insufficient evidence to support the court's finding that she engaged in the offending conduct. Instead, she argues only that there was insufficient evidence to prove M.M. exhibited any of "the requisite behaviors/symptoms listed under . . . subdivision (c) – namely, severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others." According to mother, the evidence showed nothing more than that M.M. was hostile toward her father and experiencing "emotional issues [that are] normal in the context of a family breakup and a custody battle." We disagree.

In *In re Christopher C.* (2010) 182 Cal.App.4th 73, the court concluded that a child's willingness to make false allegations was demonstrative of serious emotional damage within the meaning of subdivision (c). The petitioner in *Christopher C.* presented evidence that the parents' conduct during an ongoing custody dispute had

33

caused the children to make false "allegations of sexual and physical abuse," and rendered them "unable to distinguish reality from fiction." (*Id*. at p. 84) On appeal, the father conceded there was sufficient evidence that the parents had engaged in the offending conduct, but argued there was no evidence that such conduct "place[d] any of the children [at] a substantial risk of serious emotional harm.'" (*Ibid*.) The court rejected the argument, noting that investigators had concluded the "past history of claims within the family [had caused] . . . the children [to] become accustomed to blithely accusing family members of serious abuse without regard for the truth." (*Ibid*.) The court explained that "it is quite unusual and disconcerting to see children having no difficulty falsely accusing their [family members] of sexually abusing them . . ." (*Id*. at p. 85.) As in *Christopher C*., we conclude that M.M.'s willingness to fabricate something as serious as sexual abuse to avoid contact with father is, in itself, suggestive of serious psychological impairment.

The record also contains substantial evidence that M.M. engaged in conduct separate and apart from making false abuse allegations that evidences serious emotional harm. Numerous witnesses testified that the child's attitude toward father underwent a complete transformation during the latter stages of 2012. Father, paternal grandfather, paternal grandmother and M.O. all testified that prior to the fall of 2012, M.M. and father shared a normal, caring relationship. Jane Shatz similarly testified that based on her interviews with family members and professionals who had treated the family, she believed the child had previously had a "very close and fun" relationship with father. Beginning in 2012, however, the child completely withdrew from father, refusing to even be in the same room with him. Moreover, during the jurisdictional hearing, the child denied she had ever had a positive relationship with father.

Several witnesses testified that in addition to withdrawing from father, M.M. displayed extreme anxiety whenever she was forced to be in his presence or discuss her allegations against him. According to mother's own testimony, M.M. had a "horrible" reaction when the family court ordered temporary custody to father in July of 2013, causing the child to "cry[] for help" and suffer an "asthma attack." Mother asserted the

child exhibited similar behavior any time she had to visit her father. Shatz testified that M.M. exhibited "signs of severe anxiety" when she met with father during the child evaluation. In December of 2013, a school counselor reported that M.M. became "tearful" when discussing the allegations against father. DCFS social worker Mendoza testified that M.M. displayed symptoms of "extreme anxiety" before attending court meetings or when interviewed about the abuse allegations, which included difficulty sleeping, lack of appetite and vomiting. In July of 2014, the child told DCFS that merely seeing her father caused her to feel "stressed, depressed [and] anxi[ous]."[3]

There was also evidence that M.M. exhibited signs of emotional harm even when not in father's presence. In October of 2013, M.M. told DCFS that she "'breaks down and cries at least once a day at school' over her situation." A school counselor reported M.M. was performing poorly "due to . . . the constant back and forth between her parents[] and the emotional toll the current situation is taking on her." Charles Charles B. testified that M.M. displayed anxiety in mother's home as a result of "nonstop questioning" regarding the child's visits with her father. Charles B. also testified that mother's conduct had forced M.M. to "carry a lot . . . more than any child should ever have to." In May of 2014, M.M.'s therapist informed DCFS the child appeared to be "emotionally exhaust[ed]."

Finally, multiple professionals who participated in the proceedings noted the negative impact mother's conduct was having on the child's emotional well-being. In her child evaluation, Shatz concluded that mother's "ruthless and inexhaustible attempts to sabotage [father's] relations with [M.M.] [had] cause[d] [the child] psychological problems that she will be dealing with for years." Shatz made similar statements during

---

**3**      In her appellate brief, mother asserts (without citation to legal authority) that M.M.'s "aversion to her father" and the extreme anxiety she exhibited in his presence "does not inherently prove serious emotional disturbance, even if caused by the mother as the trial court determined." Given that subdivision (c) specifically lists "withdrawal" and "severe anxiety" as types of behavior that indicate serious emotional damage, the child's complete rejection of her father and display of severe anxiety in his presence qualify as forms of serious emotional distress.

35

the jurisdiction hearing, testifying that mother's conduct placed M.M. at "risk of serious emotional harm," and that it would be "very detrimental to [the child's] mental health in the future if something doesn't change."  In the jurisdiction report, a DCFS investigator likewise concluded that mother and father had both engaged in conduct that caused M.M. to develop "insecure attachments with her parents as evidenced by her extreme reactivity, hostility and disdain toward the [father], coupled with her unhealthy enmeshment with and lack of boundaries with mother."

In sum, the record contains substantial evidence that M.M. fabricated allegations of sexual abuse, completely withdrew from her father and frequently exhibited signs of severe anxiety.  This evidence is sufficient to support the juvenile court's finding that M.M. was suffering serious emotional damage within the meaning of section 300, subdivision (c).

### B. Substantial Evidence Supports the Trial Court's Decision to Remove M.M. from Mother's Custody

Mother also argues there was insufficient evidence to support the court's dispositional decision to remove M.M. from her custody.  Section 361, subdivision (c) states, in relevant part:  "A dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . .: [¶]  (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's. . . physical custody."

As with the juvenile court's jurisdictional findings, we review the court's dispositional findings under the substantial evidence standard.  (See *J.K., supra,* 174 Cal.App.4th at p. 1433 ["On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings.  [Citations.]"].)  We therefore "presume in favor of the order, considering the evidence in the light

36

most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)[4]

Mother first asserts there was insufficient evidence to show that returning M.M. to her custody would present a substantial danger to the child's physical or emotional well-being. Several sets of facts support the court's substantial danger finding. First, as explained above in relation to the court's jurisdictional finding, there was substantial evidence that mother's attempts to alienate M.M. from father had caused the child to suffer serious emotional damage. Second, Jane Shatz testified that mother's offending conduct was "likely [to] . . . continue until [she] gets some real help . . . so that she understands she cannot do those things anymore." Third, during the juvenile court proceedings, mother never acknowledged she had engaged in any wrongdoing, refused to take any responsibility for her daughter's condition and displayed no insight into how her conduct had contributed to the child's problems. This evidence is sufficient to support the juvenile court's finding that if M.M. was left in mother's custody, she would continue

---

**4**     Mother argues that because section 361, subdivision (c) requires proof of clear and convincing evidence, we must "apply the substantial evidence test with somewhat less deference." However, as explained by our Supreme Court: "[The clear and convincing evidence] standard was adopted . . . for the edification and guidance of the trial court, and was not intended as a standard for appellate review. 'The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the [trier of fact] to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.' [Citations.]" (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [fn. omitted].) "Thus, on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' [Citation.]" (*Sheila v. Superior Court* (2000) 84 Cal.App.4th 872, 881 [analyzing clear and convincing standard set forth in section 361.5]; see also *In re Heidi T.* (1978) 87 Cal.App.3d 864, 871.)

to engage in alienating conduct, thereby placing the child at substantial danger of additional emotional harm.[5]

Mother also asserts that removing M.M. from her custody was not the only reasonable means to protect the child. According to mother, the court could have simply ordered M.M. to "remain[] in . . . mother's home under the condition that . . . [mother] not discuss . . . father with [M.M.], [and] that [mother] abide by all of the [court's] orders." Alternatively, mother suggests "there [wa]s no good reason not to permit [the child] to remain in mother's home with strict supervision." Again, however, mother's prior attempts to alienate the child from father, her continuing failure to acknowledge any wrongdoing and Shatz's testimony that the alienating conduct was likely to continue, were sufficient to support the juvenile court's finding that removing M.M. from mother's custody was the only reasonable means of ensuring the child's protection.[6]

---

[5]     Mother contends that there was no need to remove M.M. from her home because the "severe emotional distress and anxiety" the child exhibited was "not related to her being with her mother, but is from contact with her father and from the court process that is ordering her to have contact with her father." The juvenile court found, however, that mother's conduct caused the anxiety and other forms of withdrawal the child displayed toward the father. Mother has not challenged that finding on appeal. Moreover, as summarized above, there was evidence that mother engaged in conduct that caused the child to experience anxiety even when she was not in father's presence.

[6]     Mother also suggests the juvenile court failed to comply with section 361, subdivision (d), which requires the court to "state the facts on which the decision to remove the minor is based." The court's statement of decision contained detailed factual findings supporting its conclusion that mother engaged in alienating conduct that resulted in serious emotional damage to the child. The court's statement also explained that, on the issue of disposition, it had been "guided by the testimony of Doctor Shatz." Shatz, in turn, had testified that mother was likely to continue to engage in parental alienation; that leaving M.M. in mother's custody would be "very detrimental to [the child's] mental health"; and that the appropriate remedy in cases of severe alienation was to "severely limit" the child's contact with the alienating parent "for a period of time." The court's statement makes clear that its removal decision was based on Shatz's findings and recommendations.

Moreover, even if we were to assume the court's statement did not sufficiently explain the basis for its removal decision, a court's failure to comply with the

38

**DISPOSITION**

The juvenile court's orders are affirmed.


ZELON, Acting P. J.

We concur:


SEGAL, J.


BECKLOFF, J.[*]

---

requirements of subdivision (d) is generally deemed harmless error when "'it is not reasonably probable [that] such finding[s], if made, would have been in favor of continued parental custody.'" (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218 [quoting *In re Clyde H*. (1979) 92 Cal.App.3d 338, 347].) In this case, the court made it overwhelmingly clear it intended to remove M.M. from mother's custody.

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.